IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:15-cv-396

| | | |
|---|---|---|
| RENEWABLE NUTRIENTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| TRIEA TECHNOLOGIES, LLC, as | ) | |
| successor by merger to TRIEA SYSTEMS, | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Renewable Nutrients, LLC, by and through undersigned counsel, for its

Complaint against the Defendant, alleges as follows:

1.      This is an action for breach of contract; for trademark infringement, unfair

competition, and false designation of origin arising under the Lanham Act, 15 U.S.C. §§ 1051 *et*

*seq.;* and for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1338.

3.      This Court has personal jurisdiction over the Defendants because, among other

things, they entered into a long-term contract with a North Carolina company, and they have

committed acts of infringement directed at North Carolina.

4.      Venue is proper pursuant to 28 U.S.C. § 1391 because all defendants are

considered residents of this district for venue purposes and a substantial part of the events and

omissions giving rise to the claims occurred in this district.

28079950v4

**PARTIES**

5.      Plaintiff Renewable Nutrients, LLC is a North Carolina limited liability company with its principal place of business in Southern Pines, Moore County, North Carolina. Renewable Nutrients was formerly known as Renewable Organics, LLC.

6.      Defendant Triea Technologies, LLC ("Triea") is a Delaware limited liability company with its principal place of business in Ellicott City, Maryland.  Triea Technologies, LLC is the successor by merger to Triea Systems, LLC.

**FACTS**

7.      This case centers on technology that extracts phosphorus from biosolids and on Triea Technologies' failure to commercialize that technology for agricultural use.

8.      Phosphorus is a crucial natural resource and vital plant nutrient that is utilized in a variety of industries.  Although phosphorus is utilized for industrial chemical production, steel production, and related processes, it is primarily used in fertilizer for agricultural and farm production.  Due to its widespread use, the world will likely reach peak phosphate production around 2030.  World demand for phosphorous, however, is increasing.  Consequently, there is an acute need to develop new and sustainable sources of phosphorus.

9.      Renewable Nutrients has proprietary technology for the extraction of phosphorous from biosolids, such as solid human and animal waste, which Renewable Nutrients licensed from the United States Department of Agriculture ("USDA").

10.      Renewable Nutrients' technology is an important contribution to the production of phosphorous and the management of wastes.  This technology extracts 85% or more of the phosphorous in biosolids, which is a higher extraction rate than any other technology. Renewable Nutrients' technology provides a new, sustainable source of phosphorous and allows

low-phosphorous biosolids to be collected and applied to land as fertilizer.  By licensing this technology to waste treatment plants and farms, Renewable Nutrients offers potential customers the opportunity to produce their own extracted phosphorus and crop-friendly fertilizers, while reducing the tons of waste trucked to disposal sites annually.

11.     Renewable Nutrients licensed the technology from the USDA in 2010.  However, at that time, the technology was not ready for commercial sales.  Renewable Nutrients licensed the technology from the USDA so that it could develop the technology for practical application, or "commercialization."

12.     Part of Renewable Nutrients' efforts to commercialize the technology was to sublicense the technology, specifically in the Agricultural Industry (a defined term in the parties' contract), to Triea.  Triea would then commercialize the technology in the Agricultural Industry, while Renewable Nutrients would continue its commercialization efforts for all other areas in which the technology could be used.

13.     Importantly, the sublicense of the technology to Triea in the Agricultural Industry is exclusive, so that only Triea has the right to commercialize the technology in that industry. This means that if Triea fails to commercialize the technology in the Agricultural Industry, then the technology will not be commercialized at all in that industry.  Moreover, pursuant to Renewable Nutrients' license with the USDA, described below, the USDA holds Renewable Nutrients responsible for commercialization of the technology in the Agricultural Industry.

14.     As detailed below, Renewable Nutrients also developed a trademark for its technology, known as QUICK WASH.

15.     The dispute between the parties arose because of Triea failure to commercialize the technology in the Agricultural Industry and because Defendants infringed on the QUICK WASH Mark.

### FACTS RELATING TO THE CONTRACT BETWEEN RENEWABLE NUTRIENTS AND TRIEA TECHNOLOGIES

### The USDA License and the Triea Technologies Sublicense

16.     Beginning more than 10 years ago, the USDA began researching and developing a process for removing phosphorus from biosolids.  As a result of its efforts, the USDA obtained certain valuable patent rights relating to a process for removing and recovering phosphorous from animal waste known as the "Quick Wash System".

17.     On August 18, 2010, Plaintiff entered into an exclusive license agreement with the United States Government, as represented by the USDA, as amended by an exclusive license agreement dated April 10, 2014 (collectively the "USDA License").

18.     Under the USDA License, Renewable Nutrients has an exclusive license within the United States in all technology embodied by the patent obtained by the USDA, subject only to the USDA's reservation of rights in favor of the U.S. Government.  Renewable Nutrients also has the right to grant sublicenses, subject to the terms of the USDA License and prior approval by the USDA of the proposed sublicensee.

19.     Article 6.1 of the USDA License requires Renewable Nutrients, directly or through sublicensees, to expend reasonable efforts and resources to develop the technology so that it can be practically applied or otherwise utilized.  Moreover, the USDA License requires Plaintiff, and any sublicensee, to enter into an agreement with an Contractual End User (a defined term in the parties' contract) by October 1, 2015, such that the end user processes wastes

using the technology within one year of the date of the agreement with the end user.   Failure to comply with the time requirements set forth in Article 6.1 of the USDA License is ground for termination pursuant to Article 7.2.

20.     On November 12, 2013, Renewable Nutrients entered into an Exclusive Sublicense and License Agreement (the "Sublicense") with Triea Systems, LLC, which is the predecessor in interest to Defendant Triea Technologies.  Under the Sublicense, Renewable Nutrients granted Triea Technologies an exclusive sublicense to advertise, market, distribute, license use of rent, and sell the Quick Wash System.

21.     The Sublicense incorporated, and was expressly subject to, the terms of the USDA License. Therefore, Triea undertook the contractual duties to expend reasonable efforts and resources to develop the technology for practical application and to enter into an agreement with an end user of the technology no later than October 1, 2015.

22.     In addition to these obligations, the Sublicense required Triea to bear the full cost and expenses of licensing, renting, marketing, selling, promoting, distributing, developing, and implementing the technology. Both parties anticipated that these expenses would be substantial.

23.     Triea was obligated to pay certain royalties to Renewable Nutrients, as set forth in Section IV.A of the Agreement, including a mandatory and non-refundable royalty fee of $25,000 on March 1, 2015, with an annual minimum royalty fee in the amount of $50,000 for each year thereafter.

24.     Upon execution of the Sublicense, Triea provided certain warranties.  Among these were that Triea was in compliance with all applicable tax laws.   Triea also warranted that the technology and any subsequent improvements to the technology developed by Renewable Nutrients were not subject to liens or encumbrances.

## Triea Has Not and Cannot Commercialize the Technology

25.     Triea has failed to commercialize the technology in the Agricultural Industry, and it is apparent that Triea will never commercialize the technology as required by the Sublicense. To date, and even after a notice of breach of contract and opportunity to cure those breaches of contract, Triea has provided no proof that the technology itself is any closer to commercialization than when Triea signed the Sublicense.

26.     Specific examples of Triea's failure to commercialize the technology include, but are not limited to, the following:

(a)     In August, 2014 (9 months after it signed the Sublicense), Triea entered into a contract with University of Maryland Baltimore County ("UMBC"), under which UMBC would conduct research regarding the technology.  However, the contract called for UMBC to conduct research that was duplicative of research that had already been performed.  Later, Triea would claim that UMBC had conducted valuable research and had established a "pilot plant."  In reality, the research that UMBC performed was nothing new, and the supposed pilot plant was nothing more than a laboratory set.

(b)     Triea has supposedly "presented" the technology to certain persons and entities, such as Maryland politicians, government entities, non-profit entities based in Maryland, and others.  However, Triea has failed and refused to provide Renewable Nutrients with proof that any actual contract negotiations for commercial use have taken place with these persons and entities.

(c)     Renewable Nutrients asked for updates on Triea's  progress toward commercialization, and Triea sent Renewable Nutrients status reports that contained milestones for Triea.  Subsequently, Triea failed to meet those milestones and simply

revised its own timelines for performance.  This continued until Renewable Nutrients was forced to declare Triea in breach and provide it an opportunity to cure the breaches of contract, as detailed below.

27.     A prime example of Triea's failure and inability to commercialize the product is its dealings with a company called Walk Stock Farm, Inc. ("Walk Stock").  Under the Sublicense, Renewable Nutrients must refer sales leads in the Agricultural Industry to Triea.  So, when Walk Stock contacted Renewable Nutrients about the Quick Wash System in October, 2014, Renewable Nutrients promptly referred Walk Stock to Triea Technologies and encouraged Triea to follow up on the lead.  However, instead of dealing with Walk Stock as a potential customer and offering commercialized technology to Walk Stock, Triea asked Walk Stock to invest in Triea as part of Triea's efforts to raise capital.  In December, 2014, Triea sent Walk Stock a draft Memorandum of Understanding ("MOU"), which called for Walk Stock's investment in Triea.  Walk Stock declined.  Triea compounded its mishandling of the Walk Stock relationship by failing to respond to Walk Stock's basic requests for information and failing to follow up with Walk Stock as that company requested.

28.     Walk Stock was the only viable sales lead that was available to Triea, and Triea treated Walk Stock as a potential investor, not a potential end user of the technology.  The reason, of course, is that Triea had not commercialized the technology and had nothing to offer. In fact, in a letter dated April 8, 2015, Triea's Chairman, Art Lazerow, acknowledged that nobody in the Agricultural Industry is "willing to commit contractually" to Quick Wash "until Triea can fully demonstrate that the science works on their particular manure, demonstrate the process the process, the chemistry, and the operation, and prove the costs of operations and the

profitability" of Quick Wash.  As set forth below, however, Triea does not have the financial resources to complete the necessary research.

29.     As shown by its dealings with Walk Stock, most of Triea's efforts have been directed toward raising money for the company, not commercializing the technology.  In turn, Triea cannot commercialize the technology because it does not have the money to do so.  And, as shown by the following facts,  Triea is simply unable to raise the money needed to commercialize the technology:

(a)     In May, 2014, Triea Technologies (then known as Triea Systems, LLC) produced a business plan, which it then published to potential investors.  In this business plan, Triea Technologies stated that it needed to raise $6 million, in addition to $2.3 million already raised.

(b)     The May, 2014 business plan also stated that Triea would not create a prototype of the commercialized technology until the Fourth Quarter of 2015, and the prototype would only be created "depending on the availability of funds."  In light of the October 1, 2015 deadline to sign a contract with an end user, Triea set up an impossible situation in which an end user was supposed to sign a contract with Triea before the technology could even be demonstrated.

(c)     In September, 2014, Triea produced a second business plan.  In this business plan, Triea stated that it had raised $2.7 million, showing that it had raised only $400,000 of the $6 million additional funds needed.

(d)     On or about November 1, 2014, Triea produced a Private Placement Memorandum ("PPM") that was intended to be presented to investors.  The PPM must comply with the disclosure and other requirements of applicable federal and state

securities laws, which require that the PPM contain all material information about Triea, including its business and financial conditions.  When Triea revealed the details about the company in the PPM, those details showed that the company is insolvent, that it has unpaid tax debt, that the company owed insiders over $800,000 in debt, and that the funds raised by the PPM itself might be insufficient to support company operations.

(e)     None of Triea's efforts resulted in raising capital.  To date, the only known investors are Triea's leadership team and their "friends and family."  Upon information and belief, nobody outside of Triea's inner circle has invested in the company.

(f)     In early 2015, Triea announced its intention to use the crowdfunding website Indiegogo.com to raise capital.  Indiegogo.com is a website that "empowers people to activate the global community to make ideas happen," and its fundraising campaigns range from technology, to filmmaking, to fundraising for personal purposes.  Triea has stated that it intends to raise $1,000,000 on Indiegogo.com, but nothing indicates that Triea might be successful in this attempt.  And, in any event, this amount is only a fraction of the $6 million that Triea Technologies stated that it needs.

30.     Despite its failure to raise necessary capital, Triea touts its success in obtaining grant money to support its commercialization efforts.  Such funds, however, are sent directly to UMBC and are dependent, in part, on Triea making periodic cash and in-kind contributions to support the grant.  Thus, rather than being a source of funding to support commercialization efforts, the grants require Triea to *pay out* funds that, upon information and belief, it does not have.

31.     In truth, Triea does not have the money to commercialize the technology and it cannot raise the money to do so.  Despite this, Triea contends that it can keep the exclusive license to the technology in the Agricultural Industry, thereby ensuring that Renewable Nutrients' proprietary technology will never be developed for the Agricultural Industry.

<b>Triea Technologies' Other Breaches of Contract<br>and Renewable Nutrients' Attempts to Rectify the Problems</b>

32.     Triea has breached the Sublicense in a number of other ways.  These include, but are not limited to, the following:

(a)     When Triea signed the Sublicense, it warranted that it was in compliance with all applicable tax laws.  However, in its PPM, Triea revealed that it had a delinquent tax debt dating back to 2010.

(b)     Triea also warranted in the Sublicense that the technology was not subject to any liens or encumbrances.  However, in an insider transaction, Triea granted a blanket security interest to Lazerow Family LLLP.

(c)     Triea failed to timely pay the $25,000 royalty fee that was due on March 1, 2015, which it only paid when Renewable Nutrients reminded Triea of its obligation.

(d)     Triea stated that it signed a Memorandum of Understanding with "a Biotech company," which Triea later refused to identify.  Based on Triea's description of this company and its refusal to identify this company, it is clear that Triea has entered into a relationship with a company outside the Agricultural Industry, in breach of the exclusivity provisions of the Sublicense.

(e)     On September 2, 2014, Triea Technologies purported to license the technology to a newly-formed subsidiary named Quick Wash AG, LLC.   Triea did so without Renewable Nutrients' consent and in breach of the Agreement.

(f)     As detailed below in paragraph 48, Triea committed several acts of trademark infringement, each of which is a breach of the Sublicense.

33.     Beginning in late 2014, Renewable Nutrients made significant efforts to secure Triea's performance of the Sublicense and push the technology in the Agricultural Industry toward commercialization.  For example, in order to take the technology from the laboratory to the field, a "pilot plant" is required.  A pilot plant is a large scale, real-world application of the technology, which can readily be scaled up to a full operation.  In an effort to move Triea along to commercialization of the technology, Renewable Nutrients offered to lease its pilot plant to Triea on favorable terms.  Triea did not accept this offer.

34.     Renewable Nutrients also asked Triea to honor the milestones it had set for itself by amending the Sublicense to set specific deadlines.  Triea declined.

35.     In February, 2015, Renewable Nutrients concluded that Triea Technologies had made no progress toward commercializing the technology, and Triea's conduct as described above gave Renewable Nutrients legitimate concern that the technology would never be commercialized.  Moreover, on March 1, 2015, Triea missed its royalty payment.  So, on March 2, 2015, Renewable Nutrients sent a letter to Triea notifying it of certain breaches of contract and demanding that Triea cure these breaches of contract within the 90-day cure period allowed by the contract.

36.     In response, Triea took the position that it was not in breach, that no cure was needed, and that it was under no obligation to commercialize the technology at any given time.

Triea further took the position that Renewable Nutrients should withdraw its notice of breach, and Triea implied that Renewable Nutrients had failed to perform under both the Sublicense and the USDA License.

37.     During the time of the parties' discussions of Renewable Nutrients' notice of breach and Triea's opportunity to cure, Mr. Lazerow made several statements that impliedly or explicitly suggested that Triea would sue Renewable Nutrients over the Sublicense.

38.     Moreover, Mr. Lazerow has made it clear that Triea has absolutely no intent to address any of Renewable Nutrients' concerns. For example, Mr. Lazerow stated in a letter to Renewable Nutrients' counsel that Triea had entered into MOUs with several companies regarding the technology. When Renewable Nutrients' counsel asked for copies of these MOUs, Triea refused to provide them. Upon information and belief, those MOUs either do not exist or they prove Triea's breach of the Sublicense.

39.     Triea's conduct has made clear that it has not commercialized the technology, it cannot commercialize the technology, and it refuses to cure its breaches of contract. Moreover, because the Sublicense grants Triea an exclusive license of the technology in the Agricultural Industry, the technology will never be commercialized for this industry if Triea keeps the exclusive license. For that reason, simultaneously with filing this Complaint, Renewable Nutrients terminated the Sublicense and took all appropriate steps to effect this termination.

## FACTS RELATING TO THE TRADEMARK

40.     Renewable Nutrients owns rights in various trademarks that it has used and uses in connection with the advertisement, marketing, offering for sale, and sale of services, including "a technology and process for removing and recovering phosphorus from industrial and municipal waste treatment plants and confined animal operations" and a "process for producing

from municipal bio-solids a low phosphorus fertilizer" (such technology and processes collectively referred to as the "Technology").  Among these is its trademark QUICK WASH ("the QUICK WASH Mark"), which Renewable Nutrients has used and uses in connection with the advertisement, marketing, offering for sale, and/or sale of the Technology.  The QUICK WASH Mark is the subject of a pending federal trademark application, U.S. Application Serial No. 86/298,440, which was filed on June 3, 2014.

41.     At all times relevant to this Complaint, Renewable Nutrients has used its QUICK WASH Mark in connection with the advertisement, marketing, offering for sale, and/or sale of the Technology in interstate commerce.

42.     Renewable Nutrients prominently displays its QUICK WASH Mark on its website, http://www.renewablenutrients.com, as well as in marketing materials, print media, and on various other promotional materials.

43.     Renewable Nutrients has invested great time, effort, and resources in the development of a distinctive and well-known brand, such that its services have become widely recognized as emanating from Renewable Nutrients and as maintaining only the highest quality standards.

44.     The QUICK WASH Mark, when used in connection with the Technology, indicates to members of the purchasing public that these services originate from and are provided by Renewable Nutrients only, and no other person or entity.

45.     Renewable Nutrients has extensively used its QUICK WASH Mark to identify and distinguish its services from those of its competitors, such that the QUICK WASH Mark represents and possesses significant goodwill, which is of great monetary and reputational value to Renewable Nutrients.

46.     Because of Renewable Nutrients' significant expenditure of time, effort, and money in the advertising, marketing, and promotion of the QUICK WASH Mark, the QUICK WASH Mark has developed and now possesses strong secondary meaning to consumers of the Technology, such that the consuming public identifies it as indicating services of distinctively high quality originating from Renewable Nutrients.

47.     The Sublicense grants to Triea limited rights in the QUICK WASH Mark.  The Sublicense specifies that Triea may only use Renewable Nutrients' trademark as approved in writing and only in the manner authorized by Renewable Nutrients.  Specifically, Triea may only use the trademark in connection with the "sale, rental, license, lease, marketing, promotion and advertising" of the technology, and Triea may not use the trademark in its corporate name and/or on the Internet.  Any use of the trademark must be preceded by Renewable Nutrients' written approval.

48.     Triea has engaged in numerous acts that infringe on the QUICK WASH Mark. These acts include, but are not limited to, the following:

(a)     In May and September, 2014, Triea created written business plans, which it then published to potential investors.  Throughout these business plans, Triea Technologies used the QUICK WASH Mark, all without approval.

(b)     Sometime prior to September, 2014, Triea began using the QUICK WASH Mark on its website without approval.

(c)     On or about September 2, 2014, Mr. Lazerow caused to be formed a company called Quick Wash Ag, LLC, thereby using the QUICK WASH Mark without approval.

     (d)     On or about November 1, 2014, Triea Technologies published a document known as a Private Placement Memorandum ("PPM"), which it used in an attempt to raise capital for the company.  Throughout the PPM, Triea Technologies used the QUICK WASH Mark without approval.

     (e)     Triea has used the QUICK WASH Mark throughout its social media outlets, including Twitter, Facebook, YouTube, and LinkedIn, all without approval.

     (f)     In early 2015, after it had failed to find investors for the company, Triea proposed to use the crowdfunding website Indiegogo to raise money, using the QUICK WASH Mark without approval.

     (g)     Upon information and belief, Triea has constantly used the QUICK WASH Mark at trade show booths, in white papers, in press releases, and by similar means that were intended to profit from the use of the mark, all without approval.

49.     None of the above uses of the QUICK WASH Mark were approved by Renewable Nutrients in writing as required by the Sublicense, except for a narrow approval of the design of the QUICK WASH Mark on Triea's website, and Renewable Nutrients did not approve any other use of the mark by Triea.

50.     On March 23, 2015, counsel for Renewable Nutrients specified to Triea's counsel the numerous acts of trademark infringement that Triea committed.  In a subsequent correspondence, Triea falsely stated that Renewable Nutrients had "granted blanket permission" in a July 14, 2014 email for Triea to use the QUICK WASH Mark.  No such email exists, and Renewable Nutrients has never granted any such permission to Triea.  Upon information and belief, both prior and subsequent to March 23, 2015, Triea has willfully infringed on the QUICK WASH Mark.

- 15 -

51.     Based upon Triea's willful infringement of the QUICK WASH Mark and its false assertion of permission to use the mark, Renewable Nutrients has and will lose the ability to control the consumer perception of its products and services offered under the QUICK WASH Mark.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

52.     Paragraphs 1 through 51 are realleged and incorporated herein by reference.

53.     Triea entered into a contract with Renewable Nutrients, in the form of the Sublicense.

54.     Triea has breached the contract as more specifically described above, including but not limited to its failure to commercialize the technology and its use of the QUICK WASH Mark beyond the terms of the limited license granted to Triea.

55.     Triea's breach of contract has proximately caused Renewable Nutrients to suffer damages in an amount to be proven at trial.

56.     Renewable Nutrients is also entitled to injunctive relief to prevent Triea from using the QUICK WASH Mark.

## SECOND CAUSE OF ACTION
### (Trademark Infringement, Unfair Competition, and False Designation of Origin under 15 U.S.C. § 1125(a))

57.     Paragraphs 1 through 56 are realleged and incorporated herein by reference.

58.     This claim arises under 15 U.S.C. § 1125(a) for willful and deliberate infringement, unfair competition, and false designation of origin, all with regard to Defendants' unauthorized use of Renewable Nutrients' QUICK WASH Mark.

59.     The QUICK WASH Mark is valid, protectable, and enforceable.

60.     Renewable Nutrients has continuously and exclusively used QUICK WASH since 2014 in connection with the advertisement, promotion, offer, and sale of real estate management, real estate development, and residential and commercial building construction services, and related services, prior to Defendants' use of QUICK WASH in connection with similar, related, and/or identical services.

61.     By reason of Renewable Nutrients' continuous and exclusive use and promotion of QUICK WASH, as well as the distinctiveness of QUICK WASH, consumers associate QUICK WASH with a single source of services provided under QUICK WASH by Renewable Nutrients.

62.     Defendants use QUICK WASH to promote the sale of technology that is identical to those offered by Renewable Nutrients in connection with QUICK WASH.

63.     Upon information and belief, Defendants have used QUICK WASH in connection with the advertisement, promotion, offer, and sale of the technology within the State of North Carolina, and to citizens of the State of North Carolina, and elsewhere.

64.     Defendants' use of QUICK WASH creates a likelihood of confusion, mistake, or deception among consumers between Defendants' services and the services offered by Renewable Nutrients in connection with QUICK WASH.

65.     At the time Defendants began using QUICK WASH, Defendants had actual and constructive notice of Renewable Nutrients' federally registered QUICK WASH Mark under 15 U.S.C. § 1072, and had actual notice of Renewable Nutrients' QUICK WASH trade name.

66.     Defendants knew, or should have known, that their use of QUICK WASH in connection with the technology would cause confusion, mistake, or deception among consumers of those services.

67.     Upon information and belief, Defendants knew of Renewable Nutrients' prior use of QUICK WASH, and intended to induce and did induce, and intends to induce and will induce, consumers to purchase Defendants' services by trading off the goodwill built up by Renewable Nutrients in QUICK WASH.

68.     Defendants' use of QUICK WASH is likely to cause consumers and other members of the public to believe in error that Defendants' services have been authorized, sponsored, approved, or endorsed by Renewable Nutrients, or that Defendants are in some way affiliated with Renewable Nutrients.

69.     Defendants' wrongful acts alleged herein constitute trademark infringement, unfair competition, and false designation of origin in violation of Renewable Nutrients' rights under 15 U.S.C. § 1125(a) and, on information and belief, have been deliberate, willful, and in disregard of Renewable Nutrients' rights.

70.     Defendants' wrongful acts alleged herein have permitted and/or will permit Defendants to earn substantial revenues and profits on the strength of Renewable Nutrients' extensive advertising, consumer recognition, and goodwill associated with QUICK WASH.

71.     By reason of Defendants' wrongful acts alleged herein, Renewable Nutrients has suffered and is continuing to suffer irreparable damage to its business, trade, reputation, and goodwill as a result of the erroneous perception that the goods and services of Defendants are affiliated with, sponsored by, approved by, or originate from Renewable Nutrients.

72.     As a result of Defendants' wrongful acts alleged herein, Renewable Nutrients has suffered and is continuing to suffer irreparable injury.  Renewable Nutrients cannot be adequately compensated for these injuries by damages alone, and Renewable Nutrients has no adequate remedy at law for Defendants' infringement of its rights.  Renewable Nutrients is

entitled to preliminary and permanent injunctive relief, Defendants' profits trebled, as well as its attorneys' fees and costs pursuant to 15 U.S.C. § 1117.

### THIRD CAUSE OF ACTION
**(Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1)**

73.     The allegations in Paragraphs 1 through 72 above are realleged and incorporated herein by reference.

74.     At all relevant times, Defendants were engaged in commerce as defined by Chapter 75 of the North Carolina General Statutes.

75.     The wrongful conduct of Defendants, as alleged above, constitutes unfair or deceptive acts or practices, which has injured and will continue to injure the Renewable Nutrients and which has resulted and will continue to result in damages to Renewable Nutrients.

76.     As a direct and proximate result of this unfair and deceptive conduct, Renewable Nutrients has been damaged and is entitled to a judgment against Defendants for actual damages, and those damages are to be automatically trebled pursuant to N.C. Gen. Stat. § 75-16. Renewable Nutrients is also entitled to an award attorney fees pursuant to N.C. Gen. Stat. § 75-16.1.

WHEREFORE, Plaintiff Renewable Nutrients, LLC prays that this Honorable Court:

1.     Judgment for Renewable Nutrients on its causes of action against Triea for breach of contract; for trademark infringement, unfair competition, and false designation of origin under 15 USC § 1125(a); and for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1.

2.     Permanent injunctive relief against Triea, its officers, directors, agents, and employees and all those in active concert or participation with Triea, including its business partners who receive actual notice of the judgment by personal service or otherwise, as follows:

a)      from further commercial use of QUICK WASH, including any similar variation thereof, either alone or in combination with other words, names, or symbols, on or in connection with the removal of phosphorous from animal and human tests;

b)      from performing or committing any other acts falsely representing Triea's products and services, or which are likely to cause confusion or mistake in the mind of the purchasing public, or to lead purchasers or the trade to believe that Triea's products and services come from or are the products and services of Renewable Nutrients, or are somehow sponsored by, associated with, affiliated with, or connected with Renewable Nutrients, or that there is some relation, association, affiliation, or connection between Renewable Nutrients and Triea;

c)      from passing off, or inducing or enabling others to sell or pass off, Triea's products and services as those of Renewable Nutrients; and

d)      from otherwise unfairly competing with Renewable Nutrients, and from any other acts which discourage, dilute, or destroy the public's recognition of QUICK WASH.

3.      That upon final judgment this Court issue a Writ to the United States Marshal that directs the Marshal to seize and impound all of Triea's advertising materials used to infringe QUICK WASH, and that all of these items be destroyed.

4.      An award of actual, statutory, multiple, treble, exemplary, enhanced, and/or punitive damages, plus interest, and an accounting of and disgorgement of Triea's profits, for Triea's violations of 15 U.S.C. § 1125(a), pursuant to 15 U.S.C. § 1117, and N.C. Gen. Stat. 75-16.

- 20 -

5.      A determination that this case is exceptional, entitling Renewable Nutrients to,

*inter alia*, reasonable attorneys' fees under 15 U.S.C. § 1117, and an award of attorney fees

under N.C. Gen. Stat. § 75-1.1.

6.      An award of interest, including pre- and post-judgment interest.

7.      The costs of this action be taxed against Triea.

8.      A jury trial on all issues so triable.

9.      Such other and further relief as this Court deems just and proper.

This the 15th day of May, 2015.

WILLIAMS MULLEN

BY: /s/Camden R. Webb
Camden R. Webb
N.C. State Bar No. 22374
crwebb@williamsmullen.com
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
P.O. Box 1000
Raleigh, NC  27602
Telephone (919) 981-4000
Facsimile (919) 981-4300
*Attorneys for Plaintiff*